UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
UNITED STATES OF AMERICA,

          - against -                        **MEMORANDUM & ORDER**

ANGELO GIGLIOTTI, ELEONORA             15 CR 204 (RJD)
GIGLIOTTI, GREGROIO GIGLIOTTI, and
FRANCO FAZIO,

                   Defendants.
------------------------------------------------------------ x

DEARIE, District Judge

Defendants Gregorio Gigliotti, his wife Eleonora Gigliotti, and their adult son Angelo Gigliotti are charged with, *inter alia*, conspiracy to import and importation of cocaine, in violation of 21 U.S.C. §§ 952(a), 960(a)(1), 960(b)(1)(B)(ii), and 963. Indictment, ECF No. 45; Superseding Indictment, ECF No. 51. The cocaine was allegedly stashed inside shipments of produce sent from Costa Rica to an import-export company owned by Gregorio. Memorandum of Law in Support of Pretrial Motions [hereinafter Defs.' Mem.], ECF No. 76 at 3.

Defendants submit joint pretrial motions, seeking, *inter alia*, an order from the Court: (1) suppressing the evidence seized from Cucino Amodo Mio, a restaurant owned by Gregorio and Eleonora, as the fruit of a pretextual and warrantless search; and (2) suppressing evidence obtained from a wiretap on the landline in Cucino Amodo Mio, because the wiretap was not supported by probable cause. For the reasons discussed below, the Court denies defendants' suppression motions.

## BACKGROUND

1. Wiretap of Cucino Amodo Mio's Landline

On June 30, 2014, the Honorable Arthur D. Spatt, United States District Judge for the Eastern District of New York, granted the government's application for authorization to intercept

conversations on the landline in Cucino Amodo Mio. Defs.' Mem. at Ex. 3 (affidavit in support of wiretap). According to the affidavit submitted in support of the wiretap application, the sources of probable cause for the wiretap included, *inter alia*, the following:[1]

Beginning in or about 2007, the Italian Justice Ministry, together with Italian law enforcement authorities, commenced an investigation into sources of drug trafficking into Italy, including by individuals based in New York. Id. at ¶ 19. Ultimately, hundreds of people were arrested, both in Italy and the United States. Id. Among those prosecuted in the Southern District of New York were an Italian national living in Queens, Giulio Schirippa, and an American co-conspirator, Christopher Castellano. Id. Castellano proffered with the government, advising that he had personally observed his and Schirippa's cocaine supplier meet with Gregorio and later learned that Gregorio had purchased $50,000 in cocaine. Id. at ¶ 21. Castellano was shot and killed in 2009, while free on bail pending disposition of his case. Id. at ¶ 22.

Castellano and Schirippa's cocaine supplier ("CI-1") later pled guilty to a narcotics-trafficking felony charge and cooperated with the government.[2] Id. at ¶ 23. During this cooperation, CI-1 informed the government that he/she had sold cocaine to Gregorio on numerous occasions, which Eleonora would then take to Italy for distribution. Id. at ¶ 24-25. CI-1 believed that Gregorio was purchasing this cocaine through funding obtained from Anthony Federicci—a member of the Genovese organized crime family La Cosa Nostra—because he/she had observed Gregorio and others bringing large sums of cash to and from a social club adjacent to Cucino Amodo Mio owned by Federicci. Id. at ¶¶ 12, 25.

---

[1] The application also discussed toll records for the restaurant's landline, which allegedly show numerous calls to suspicious numbers, such as co-defendant Franco Fazio. Id. at ¶¶ 39-47.

[2] CI-1 requested that this cooperation be taken into consideration with respect to his/her asylum petition. Id. at ¶ 23.

A second confidential informant ("CI-2"), also criminally associated with Schirippa, advised the government that Schirippa owed Gregorio a large sum of money and that the informant had once seen Schirippa make a payment of $30,000 in cash to Gregorio. Id. at ¶¶ 26, 28. A third confidential informant ("CI-3")—an individual with prior narcotics criminal history cooperating in hopes of obtaining consideration on pending criminal charges—said that Gregorio had complained in the informant's presence that Schirippa and Castellano owed him a lot of money for a shipment of cocaine to Italy that they claimed was of poor-quality and un-sellable. Id. at ¶ 29.

In November of 2011, agents conducted visual surveillance of Cucino Amodo Mio and the adjacent social club. Id. at ¶ 30. On November 9, 2011, the agents observed Gregorio meeting with an Hispanic male, John Doe 1 (later identified in a collateral investigation as a cocaine supplier), inside a nearby restaurant owned by Federicci. Id. On November 10 and the morning of November 11, agents observed Gregorio with John Doe 1, as well as two other men, John Does 2 and 3, entering and exiting Cucino Amodo Mio and the adjacent social club. Id. at ¶¶ 31-32. On the evening of November 11, 2011, agents observed John Does 2 and 3 drive up to the social club. Id. at ¶ 32. When the agents later stopped the vehicle for a speeding violation, they found $500,000 stashed inside a hidden compartment. Id. Around this same time, a fourth confidential informant ("CI-4")—an individual of undescribed background—advised the government that Gregorio had approximately 14 kilograms of cocaine hidden in a safe at Cucino Amodo Mio, which at that time would have been worth approximately $500,000. Id. at ¶ 33.

In February of 2014, Gregorio stated in the presence of CI-3 that he had recently travelled to Italy in search of buyers for 10 kilograms of cocaine and had left 3 kilograms in Italy with his "cousin," to search for better offers. Id. at ¶ 35. A few months later, an Italian investigation

3

shared its intercept of a call between the Italian phone number of co-defendant Franco Fazio, Gregorio's cousin, and the Cucino Amodo Mio landline. Id. at ¶ 37. On the call, Gregorio asks Fazio if "all the oil [had] been given to [his] buddy." Id. When Fazio replies yes, Gregorio responds "[o]kay, thirty-one, all right." Id. The agents believed that "oil" was code for cocaine and "thirty-one" was the price per kilogram of cocaine, in thousands. Id. at ¶ 38.

2. Search of Cucino Amodo Mio

On March 9, 2015, the Honorable Cheryl L. Pollak, United States Magistrate Judge for the Eastern District of New York, granted the government's application to search the premises of Cucino Amodo Mio for records relating to the conspiracy to import cocaine and computers or storage media that may contain such records. Defs.' Mem. at Ex. 1 (affidavit in support of search warrant) at Attachment A. The sources of probable cause for this search warrant included numerous conversations, recorded on the wiretap of Cucino Amodo Mio's landline, implicating Gregorio, Eleonora, and Angelo in a conspiracy to import cocaine from Costa Rica through shipments of produce to Fresh Farm Produce Export Corp. ("Fresh Farm"), an import-export company owned by Gregorio. Id. at ¶¶ 5, 7, 9-13, 17-19, 21-23, 26-29. On a few of these phone calls, Gregorio discusses using the computer in Cucino Amodo Mio's office to send emails to co-conspirators and look up shipping containers and implicates Cucino Amodo Mio as being involved in the operations, saying to a co-conspirator that he would contact him through his Cucino Amodo Mio email, not Fresh Farm, because "Cucino Amodo Mio is *me* as well." Id. at ¶¶ 25-29 (emphasis added). As a result of information gleaned from these recordings, agents of the United States government were able to intercept two separate shipments of yucca to Fresh Farm and recover approximately 55 kilograms of cocaine stashed inside the containers. Id. at ¶¶ 20, 23.

4

Also included in the search warrant application was information gathered during a March 3, 2015, warrantless administrative search of Cucino Amodo Mio, conducted by an investigator from the New York State Liquor Authority ("NYSLA") at the request and with the participation of two detectives from the New York City Police Department who were part of the criminal investigation. Government's Memorandum of Law in Opposition to the Defendants' Pretrial Motions [hereinafter Gov't Mem.], ECF No. 95 at 5-7; ECF Nos. 77-79 (affidavits in support of defendants' pretrial motions). Upon arrival at the restaurant, the NYSLA investigator encountered Gregorio, Angelo, and Gregorio's other son, Andrea, and informed them that he was there to inspect the restaurant pursuant to state liquor laws. ECF Nos. 77-79; Gov't Mem. at 5-7. Over the next 45 minutes to an hour, the investigator and the two detectives searched every room of the restaurant, which occupies the main floor and basement of a three story building. ECF Nos. 77-79; Defs.' Mem. at Ex. 1, ¶ 3. In the restaurant's basement, the detectives found and photographed three locked safes, and in the restaurant's office—a separate area in the basement—the detectives found and photographed a computer, a landline, and a file cabinet with a binder marked "Fresh Farm Produce" on top. ECF Nos. 77-79; Gov't Mem. at 5-7; Defs.' Mem. at Ex. 1, ¶ 3. At the end of the visit, the NYSLA investigator prepared a violation report for an improper outdoor bar and homemade wine. Gov't Mem., Ex. 2.

Six days later, agents applied for a search warrant for Cucino Amodo Mio. Defs.' Mem., Ex. 1. The application included pictures and descriptions of the restaurant's layout and confirmed the presence of the safes, landline, computer, and Fresh Farm records in the basement. Id. at ¶¶ 3, 25. The search was executed on March 11, 2015, and produced significant physical evidence, including seven illegal firearms, ammunition, over $100,000 in cash, a computer,

shipping records, and a handwritten ledger showing the movement of large sums of money. Gov't Mem. at 8.

## PROCEDURAL HISTORY

Defendants Gregorio, Eleonora, and Angelo were indicted on April 22, 2015, on one count of conspiracy to import cocaine. ECF No. 45. A superseding indictment filed on May 6, 2015, added Fazio as a fourth defendant, as well as five more counts, including, *inter alia*, importation of cocaine and unlawful use and possession of firearms. ECF No. 51.

On August 19, 2015, defendants Gregorio, Eleonora, and Angelo filed joint pretrial motions, seeking an order from the Court: (1) suppressing the evidence seized from Cucino Amodo Mio as the fruit of a pretextual and warrantless search; (2) directing the government to provide additional information about the nature of its cooperation with Italian authorities during the criminal investigation; (3) excluding evidence obtained pursuant to grand jury subpoenas that instructed recipients not to disclose the existence of the subpoena; (4) suppressing evidence obtained from the wiretap on the landline in Cucino Amodo Mio because the wiretap was not supported by probable cause; (5) requiring the government to disclose whether it acquired information from previously undisclosed methods and sources; (6) requiring the government to identify all Brady and Giglio material immediately and to provide exhibits in advance of trial; (7) directing the government to disclose any Rule 404(b) evidence; and (8) directing the government to make immediate expert-witness disclosure. ECF No. 76. During oral argument on defendants' joint pretrial motions on October 8, 2015, the Court addressed the routine motions and requested further information from the government regarding the grand jury subpoenas and cooperation with Italian authorities. ECF No. 100. The Court now rules on the suppression motions.

DISCUSSION

1. Suppression of Evidence Seized from Cucino Amodo Mio

Defendants move to suppress the evidence seized from Cucino Amodo Mio during the execution of the search warrant as fruits of a "pretextual and warrantless" search.[3] While defendants' argument is not entirely without merit, the Court ultimately denies the suppression motion and upholds the search warrant under the "independent source" doctrine.[4]

The Supreme Court recognized in New York v. Burger that warrantless administrative searches of "commercial propert[ies] employed in 'closely regulated' industries" are constitutionally permissible where (1) "a 'substantial' government interest . . . informs the regulatory scheme pursuant to which the inspection is made," (2) "the warrantless inspections" are "necessary to further the regulatory scheme," and (3) "the statute's inspection program, in terms of the certainty and regularity of its application," provides "a constitutionally adequate substitute for a warrant." 482 U.S. 691, 700, 702-03 (1987) (internal citations, quotation marks, and alterations omitted). Here, both sides agree that the relevant New York liquor law satisfies the requisite criteria.

Defendants argue, however, that the March 3 inspection of Cucino Amodo Mio was transparent abuse of the NYSLA's authority to conduct warrantless administrative searches of commercial premises, because the primary purpose of the inspection was to gain information for

---

[3] Defendants also move to suppress any evidence obtained *during* the March 3 search. However, the government states that it does not intend to introduce any such evidence at trial.

[4] As an initial matter, based on the record before the Court at this time, the Court agrees with the government that Angelo lacks standing to challenge the March 3 inspection of Cucino Amodo Mio because he did not have a legitimate expectation of privacy in the area searched. See United States v. Tranquillo, 606 F. Supp. 2d 370, 377 (S.D.N.Y. 2009) (noting that "the less private a work area—and the less control a defendant has over that work area—the less likely standing is to be found") (internal quotation marks and citation omitted). However, even assuming that Angelo had standing, his challenge would fail on the merits for the same reasons discussed herein.

7

the government's criminal investigation. For its part, the government freely admits that the NYSLA inspection occurred at the behest of criminal investigators but claims that the objective was merely to observe the layout of the restaurant. Furthermore, the government states that the NYSLA would have had to conduct an inspection anyway, as the restaurant's liquor license was about to expire. Accordingly, the government argues that the March 3 inspection is permissible as a "mixed purpose" search.

Although it has not spoken directly on point, the Supreme Court noted in Burger—when upholding the constitutionality of a warrantless administrative search of an automobile junkyard for stolen vehicles—that "[t]he discovery of evidence of crimes in the course of an *otherwise proper* administrative inspection does not render that search illegal or the administrative scheme suspect." Id. at 716-17 (noting also that there was no "constitutional significance in the fact that police officers, rather than 'administrative' agents, [we]re permitted to conduct" searches under the administrative scheme) (emphasis added). The New York Court of Appeals had found the administrative search in that case unconstitutional, noting that "[t]he fundamental defect in the [relevant administrative scheme] . . . [wa]s that [it] authorize[d] searches intended *solely* to uncover evidence of criminality . . . ." People v. Burger, 67 N.Y.2d 338, 344, 493 N.E.2d 926, 929 (1986) (emphasis added). In his dissenting opinion, Justice Brennan agreed with the New York Court of Appeals and criticized the majority opinion for "implicitly hold[ing] that if an administrative scheme has certain goals and if the search serves those goals, it may be upheld even if no concrete administrative consequences could follow . . . ." Burger, 482 U.S. at 728 (emphasizing that "[t]his [wa]s a dangerous suggestion, for the goals of administrative schemes often overlap with the goals of the criminal law").

Thirteen years later, the Supreme Court held that a vehicle checkpoint designed to interdict narcotics was unconstitutional "[b]ecause the *primary purpose* of the" checkpoint was "ultimately indistinguishable from the general interest in crime control," as opposed to the more acute public safety interests implicated by border crossings and drunk driver stops. City of Indianapolis v. Edmond, 531 U.S. 32, 48 (2000) (emphasis added). In so holding, the Supreme Court cited Burger to support the position that "while '[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis,' . . . programmatic purposes may be relevant to the validity of Fourth Amendment intrusions undertaken pursuant to a general scheme without individualized suspicion." Id. at 45-46 (quoting Whren v. United States, 517 U.S. 806, 813 (1996)).

Using this and other precedent, the Fourth, Tenth, and Eleventh Circuits have established a general rule that an administrative search should be considered a pretext, and thus deemed impermissible, if the *sole* or *primary* purpose of the search was to gather evidence of criminal activity. See Ruttenberg v. Jones, 283 Fed. App'x 121, 133 (4th Cir. 2008) (finding that administrative searches "cannot be used as a pretext for what is, in reality, a *purely* criminal investigation" because "[o]therwise, such inspections could serve as a convenient circumvention of the normal strictures placed on law enforcement officers") (emphasis added); see also United States v. Johnson, 408 F.3d 1313, 1323 (10th Cir. 2005) (noting that "an administrative inspection may encompass both an administrative and a criminal law enforcement purpose," and "the officers' motive is irrelevant" but the administrative inspection may not be "a pretext *solely* to gather evidence of criminal activity") (emphasis added) (internal quotation marks and citation omitted); Bruce v. Beary, 498 F.3d 1232, 1239 (11th Cir. 2007) ("The administrative search exception does not confer authority on law enforcement to ignore the requirement for a warrant

where 'the *primary* purpose [of the search . . .] was to detect evidence of ordinary criminal wrongdoing.'") (quoting City of Indianapolis, 531 U.S. at 37) (emphasis added); cf. Club Retro, L.L.C. v. Hilton, 568 F.3d 181, 197-99 (5th Cir. 2009) (noting that "[e]ven under a valid inspection regime, the administrative search cannot be pretextual" and finding that alcohol control, fire safety, and firearm laws "do not grant law enforcement officers unfettered discretion to conduct searches of business premises through any means of their choosing").

The Second Circuit has yet to define the precise contours of the administrative search exception. In Anobile v. Pelligrino, defendants challenged the warrantless administrative search of horse racing stables and dormitories, arguing that the state statute allowed inspections to search for evidence of horse doping, not—as was an admitted purpose of the search in that case—to look for evidence of drug use and other illegal activities by employees and visitors of the racetrack. 303 F.3d 107, 121-23 (2d Cir. 2001). The Second Circuit denied defendants' challenge as to any search of the stables, finding that such a search "f[e]ll within the scope of the regulations." Id. at 123. As for the search of the dormitories, the Second Circuit noted that this was arguably "a 'mixed purpose' [search], where the *primary* purpose [wa]s legitimate and the *secondary* purpose [wa]s not. Id. at 122 (emphasis added). However, because the dormitory search was unconstitutional on other grounds not relevant here, the Second Circuit declined to "decide whether this 'mixed purpose' search exceeded a constitutionally allowable scope." Id. at 123.

Following Anobile, at least two district courts in this Circuit have concluded that "mixed purpose" searches are permissible, so long as the administrative inspections are "legitimate." See United States v. Funaro, 253 F. Supp. 2d 286, 296-97 (D. Conn. 2003) (citations omitted) ("Law enforcement agents may conduct an administrative inspection for the simultaneous pursuit of an

10

administrative objective and the gathering of evidence for criminal purposes if the administrative inspection is *authorized and legitimate*.") (citations omitted) (emphasis added); United States v. Sorcher, No. 05-CR-0799 (NG) (RLM), 2007 WL 1160099, at *1, 5 (E.D.N.Y. Apr. 18, 2007) (citing Funaro to conclude that "absent a demonstration of *bad faith*" a warrantless inspection of a school receiving funding to provide free meals would not be unconstitutional even if the inspecting agency had both administrative and criminal investigatory objectives) (adopting report and recommendation).

In the case at hand, NYSLA investigators and other state actors, such as police officers, are clearly permitted to conduct warrantless inspections of commercial properties with liquor licenses, see N.Y. Alco. Bev. Contr. Law § 106(15) (McKinney 2014), and defendants admit that Cucino Amodo Mio's liquor license was up for renewal. At the same time, however, there is arguable merit to defendants' contention that—despite the significant evidence already assembled that readily supported a successful search warrant application just days later—any administrative enforcement concerns of the NYSLA in this case were secondary to the criminal investigatory goals of the inspection. Under the existing case law, the line between a *legitimate* administrative search and a *pretextual* administrative search is hazy and ill-defined, and the facts of this case lie in the blurred boundaries of such a determination. The Court need not, however, address today whether that line has been crossed. For, as discussed below, even if the March 3 warrantless administrative search lacked legitimacy in the Fourth Amendment context, the inclusion of limited observations from this inspection in the application for the subsequently obtained search warrant did not taint the warrant's validity.[5]

---

[5] Given the Court's decision to uphold the search warrant under the "independent source" doctrine, the Court does not reach defendants' additional argument that the NYSLA investigator falsely represented that the detectives were inspectors for the NYSLA, thereby invalidating any

11

Under the independent source doctrine, "[i]f police seize evidence pursuant to a valid search warrant obtained on the basis of information unconnected to an earlier Fourth Amendment violation, there is an independent source for the seizure, and the evidence is untainted and admissible." United States v. O'Brien, 498 F. Supp. 2d 520, 540 (N.D.N.Y. 2007) (citing Murray v. United States, 487 U.S. 533, 540-41 (1988)); see also Murray, 487 U.S. at 542 and n.3 (noting that "[t]o determine whether the warrant was independent of the illegal entry, one must ask whether it would have been sought even if [the illegal entry] had not occurred" or "if information obtained during that entry was presented to the [authorizing judge] and affected his decision to issue the warrant"); United States v. Johnson, 994 F.2d 980, 987 (2d Cir. 1993) ("Courts have applied the independent source exception in cases where the police stumble upon evidence while engaging in an unlawful search or entry, but where there was an independent basis apart from the illegal entry to allow a warrant to issue."). "For the independent source doctrine to apply '(1) the warrant must be supported by probable cause derived from sources independent of the illegal entry; and (2) the decision to seek the warrant may not be prompted by information gleaned from the illegal conduct." United States v. Mulholland, -- F. App'x --, 2015 WL 5949848, at *2 (2d Cir. 2015) (quoting Johnson, 994 F.2d at 987).

Here, by the time of the March 3 inspection, the government had already amassed a significant amount of evidence suggesting that defendants were importing cocaine and that there was a "fair probability that contraband or evidence of" this crime would be found in Cucino

---

consent to search. See United States v. Bosse, 898 F.2d 113, 115 (9th Cir. 1990) ("'[A]ccess gained by a government agent, known to be such by the person with whom the agent is dealing, violates the fourth amendment's bar against unreasonable searches . . . if such entry was acquired by affirmative or deliberate misrepresentation of the nature of the government's investigation.'") (alteration in original) (citation omitted). In any event, consent is not necessary if the administrative search exception applies. See Anobile, 303 F.3d at 123 ("It is axiomatic that a state actor does not need consent to conduct a constitutionally permissible search.").

12

Amodo Mio. Illinois v. Gates, 462 U.S. 213, 238 (1983). The government had recorded numerous suspect phone conversations placed from Cucino Amodo Mio's landline. In some of these calls, defendants discussed using the restaurant's computer to contact co-conspirators and look up shipping containers, and in one call Gregorio implied that Cucino Amodo Mio was involved in the operations, stating to a co-conspirator that "Cucino Amodo Mio is me as well." Moreover, the government had seized 55 kilograms of cocaine stashed in Fresh Farm produce containers, which is highly suggestive of the fact that Gregorio was comfortable blurring the lines between his legitimate and illegitimate businesses. Given this overwhelming independent support for the search warrant, any information gleaned from the March 3 inspection was not merely redundant but excessively so. Similarly, given the length and extent of the criminal investigation prior to that point, it is beyond contention that the decision to seek the search warrant was not prompted in any way by the March 3 inspection.

Seemingly conceding this point, defense counsel instead maintained during oral argument that the search warrant application would have been insufficiently particular as to the place to be searched, without knowledge of the layout of Cucino Amodo Mio's basement. The government admits that the agents were not aware of the exact layout of the restaurant's basement prior to the March 3 inspection. Indeed, determining this layout was part of the reason the detectives suggested an inspection of Cucino Amodo Mio to the NYSLA. Nonetheless, the government argues that the search warrant would not have lacked particularity, even without a description of the restaurant basement's layout. The Court agrees.

"To protect against unreasonable searches and seizures, the Fourth Amendment states that 'no warrants shall issue, but upon probable cause, supported by oath or affirmation, and *particularly describing* the place to be searched, and the persons or things to be seized.'" United

13

States v. Clark, 638 F.3d 89, 94 (2d Cir. 2011) (quoting U.S. Const. amend. IV) (emphasis added). "Particularity concerns frequently arise in circumstances where the description in the warrant of the place to be searched is so vague that it fails reasonably to alert executing officers to the limits of their search authority . . . or where the place described in the warrant does not comport with the place confronting officers when they attempt execution . . . ." Id. (citations omitted). At the same time, the Supreme Court has stated that "[a] lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search." United States v. Ross, 456 U.S. 798, 820-21 (1982). Furthermore, "'affidavits for search warrants . . . must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion.'" United States v. Waker, 534 F.3d 168, 171 (2d Cir. 2008) (quoting United States v. Ventresca, 380 U.S. 102, 108 (1965)).

With these principles in mind, Judge Cote held that the search of a storage room in the basement of a restaurant was reasonable, despite the fact that the restraining order[6] only authorized law enforcement officials to "'enter . . . the Restaurant Business,' which had been described as 'located on the second floor at 900 Morris Park Avenue.'" United States v. Rudaj, No. 04-CR-1110 (DLC), 2005 WL 2420360, at *2-3 (S.D.N.Y. Oct. 3, 2005) (noting that a "plausible reading of this phrase is as a nonrestrictive descriptor, to identify for law enforcement officials the target of their search, rather than to define its precise geographical limits"). As Judge Cote emphasized, "[t]he [o]rder authorize[d] the search of [the] restaurant for the express purpose of making an inventory of its assets." Id. at 4. Accordingly, "[a] commonsense, practical reading of th[e] [o]rder, consistent with its purpose, would allow the searching officers to enter a

---

[6] Judge Cote emphasized that "[b]ecause the [r]estraining [o]rder functioned essentially as a search warrant, it should be interpreted as if it were one." Rudaj, 2005 WL 2420360, at *2.

14

storage room directly connected to the restaurant, even if the restaurant is described as being located on the second floor, and the storage room is on another floor of the building." Id.; see also United States v. Canestri, 518 F.2d 269, 273-74 (2d Cir. 1975) (upholding search of locked storeroom in basement of one-family home where warrant permitted search of entire house); cf United States v. Bermudez, 526 F.2d 89, 96-97 (2d Cir. 1975) (affirming suppression of evidence seized from search of clothing store because the warrant, which described the location of the search as merely the street address of the building in which store was located, "could have permitted a search of the entire building" but the store was only located on two floors).

Here, the search warrant application requested authorization to search the premises of Cucino Amodo Mio, a restaurant, for all records relating to the conspiracy to import cocaine and computers or storage media that may contain such records. The agents on the criminal investigation knew from the wiretap that there was a computer and a landline in Cucino Amodo Mio long before the March 3 inspection, and it is obvious that these items would be located in a non-public space inside the restaurant, such as an office.[7] Accordingly, even without a precise description of the layout of the basement (or even of the restaurant as a whole), a "commonsense, practical reading" of the search warrant, "consistent with its purpose," would allow the agents to search a private office in the restaurant's basement. Rudaj, 2005 WL 2420360, at *4.

In sum, whether or not the March 3 warrantless administrative search of Cucino Amodo Mio violated the Fourth Amendment, the subsequently obtained search warrant was not tainted by this inspection and would have been sufficiently particular even without the information

---

[7] At any rate, the agents knew that the landline was located in the basement office of the restaurant *prior* to the March 3 inspection, because—as noted in the application for a wiretap of the landline, granted in June of the previous year—the confidential informants had been in the office and informed the agents of its location. Defs.' Mem. at Ex. 3 at ¶¶ 4, 53.

gleaned therefrom. Accordingly, defendants' motion to suppress the evidence obtained from the execution of the search warrant at Cucino Amodo Mio is denied.

2. Suppression of Evidence Obtained from Wiretap of Cucino Amodo Mio's Landline

Defendants next argue that evidence obtained pursuant to the wiretap on the landline in Cucino Amodo Mio must be suppressed, because the application did not establish probable cause to believe that drug-related conversations would be intercepted, nor could the agents have believed in good faith that such probable cause existed.

"Title III of the Omnibus Crime Control and Safe Streets Act of 1968 provides for court-ordered interceptions of communications." United States v. Yannotti, 541 F.3d 112, 124 (2d Cir. 2008) (citing 18 U.S.C. § 2518). "The statute allows a court to authorize a wiretap 'if it determines, on the basis of the facts submitted by the applicant, that there is probable cause to believe (1) that an individual was committing, had committed, or is about to commit a crime; (2) that communications concerning that crime will be obtained through the wiretap; and (3) that the premises to be wiretapped were being used for criminal purposes or are about to be used or owned by the target of the wiretap.'" Id. (quoting United States v. Diaz, 176 F.3d 52, 110 (2d Cir. 1999)).

"The standard for probable cause applicable to § 2518 is the same as the standard for a regular search warrant." Diaz, 176 F.3d at 110 (internal quotation marks and citation omitted). Probable cause is analyzed under the "totality of the circumstances." Gates, 462 U.S. at 238. That is, the issuing judge must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Id. "Due to this subjective standard, a

reviewing court generally accords 'substantial deference to the finding of an issuing judicial officer that probable cause exists,' limiting [its] inquiry to whether the officer 'had a substantial basis' for his determination." United States v. Raymonda, 780 F.3d 105, 113 (2d Cir. 2015) (quoting United States v. Wagner, 989 F.2d 69, 72 (2d Cir.1993)); see also Gates, 462 U.S. at 236, 238.

Defendants argue that the affidavit did not give Judge Spatt enough information to conclude, under the totality of the circumstances, that the four confidential informants were credible or that their information was reliable. Furthermore, defendants argue that the seizure of $500,000 from a vehicle that stopped at the social club shortly after CI-4 told investigators that Gregorio had 14 kilograms of cocaine in his restaurant's basement does not support the conclusion that Cucino Amodo Mio was used to store drugs and drug money. Finally, defendants call into question the source and value of the toll records for the landline and argue that there is no basis to conclude that Gregorio's conversations with his cousin about "oil" were code for cocaine. Such "attempts to pick apart the government's presentation," however, "ignore[] the admonition of cases like . . . Gates that a court must look at the government's support for probable cause as a whole." United States v. Bellomo, 954 F. Supp. 630, 636 (S.D.N.Y. 1997). And the affidavit taken as a whole provides ample basis for Judge Spatt's finding of probable cause.

Though Castellano and at least three of the four confidential informants were all criminals, the informants all told virtually the same story and surveillance of the restaurant and social club supported at least some of the information provided. See McColley v. Cnty of Rensselaer, 740 F.3d 817, 823 (2d Cir. 2014) (noting that district courts evaluating probable cause "when the facts offered are based upon information from a confidential informant," must

17

"examine[] the 'totality of the circumstances,'" and may consider the "extent to which [the] informant's statements . . . are independently corroborated") (internal quotation marks and citation omitted); United States v. Gagnon, 373 F.3d 230, 236 (2d Cir. 2004) ("In addition to considering an informant's veracity, reliability, and basis of knowledge, in assessing the totality of the circumstances we also evaluate whether the information an informant provides is corroborated by independent police investigation . . . because an informant who is right about some facts is more likely to be right about others . . . .") (internal citations omitted).

Furthermore, although the vehicle had no direct connection to Gregorio, he had been seen entering and exiting the social club with the vehicle's occupants the day before, and the amount of money found in the vehicle matched the street value of the cocaine that CI-4 had stated was at the restaurant. Finally, even without the suspicious toll records, the inference that Gregorio and Fazio's conversation in the interception provided by the Italian investigation contains coded references to cocaine sales is far from stretched, especially given the tip from CI-3 that Gregorio's cousin was selling his cocaine in Italy. And even if each of these items alone is not sufficient to establish probable cause for a wiretap of Cucino Amondo Mio's landline, the wiretap application as a whole, considered under the totality of the circumstances, clearly provides a "substantial basis" for Judge Spatt's determination that there was a fair probability that drug-related conversations would be intercepted. Gregorio's suspicious call to Fazio had been made from the restaurant's landline, more than one confidential informant had stated that Gregorio was operating this criminal enterprise from the restaurant, and agents had observed Gregorio meeting with a cocaine supplier outside of the restaurant.

Accordingly, defendants' motion to suppress the evidence obtained pursuant to the wiretap on the landline in Cucino Amodo Mio is denied.

CONCLUSION

For the reasons discussed above, the Court denies defendants' suppression motions. First, while defendants' argument that the March 3 warrantless administrative search of Cucino Amodo Mio violated the Fourth Amendment is not without possible merit, the Court denies defendants' motion to suppress evidence discovered during the subsequent execution of a search warrant at the restaurant and upholds that search warrant under the "independent source" doctrine. Second, the Court denies defendants' motion to suppress the evidence obtained pursuant to the wiretap on the landline in Cucino Amodo Mio, because there was probable cause to believe that drug-related conversations would be intercepted.

SO ORDERED.

Dated: Brooklyn, New York
November 6, 2015

/s/ Judge Raymond J. Dearie

‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
RAYMOND J. DEARIE
United States District Judge