FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ JUN 30 2016

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- x
UNITED STATES OF AMERICA,

               - against -

ANGELO GIGLIOTTI, ELEONORA
GIGLIOTTI, GREGORIO GIGLIOTTI, and
FRANCO FAZIO,

                   Defendants.
-------------------------------------------------------- x

**MEMORANDUM & ORDER**

15 CR 204 (RJD)

DEARIE, District Judge:

       Defendants Gregorio Gigliotti, his wife Eleonora Gigliotti, and their adult son Angelo

Gigliotti are charged with, *inter alia*, conspiracy to import and importation of cocaine, in

violation of 21 U.S.C. §§ 952(a), 960(a)(1), 960(b)(1)(B)(ii), and 963. Indictment, ECF No. 45;

Superseding Indictment, ECF No. 51; Second Superseding Indictment, ECF No. 154.

Defendants submit supplemental pretrial motions seeking, *inter alia*, an order from the Court

suppressing evidence obtained from a wiretap on the landline telephone in Cucino Amodo Mio

(the "Cucino Landline"), a restaurant owned by Gregorio and Eleonora, because, defendants

argue, (i) the government intentionally or recklessly misled the authorizing court with respect to

the probable cause supporting the wiretap application; and (ii) the collaboration between United

States and Italian law enforcement with respect to this case violated defendants' Constitutional

rights.

       Defendants' supplemental pretrial motions come on the heels of an earlier round of

pretrial motions already denied by this Court. Acknowledging that defendant Angelo Gigliotti's

present counsel joined the case after the prior motions were briefed and argued, and recognizing

the seriousness of the charges facing defendants, the Court indulged counsel's request to file

additional briefing at this late juncture. Having reviewed the supplemental briefing, however,

the Court finds that these supplemental pretrial motions are, in large part, simply an attempt to re-litigate matters already decided by this Court. Thus, for many of the same reasons that the Court denied defendants' initial pretrial motions, the Court now denies defendants' supplemental pretrial motions in their entirety.

## BACKGROUND

I.    Wiretap on Cucino Landline

On June 30, 2014, the Honorable Arthur D. Spatt, United States District Judge for the Eastern District of New York, granted the government's application for authorization to intercept conversations on the Cucino Landline. See Mem. and Order at 1-2, Nov. 6, 2015, ECF No. 104. As partially outlined by this Court previously, see id. at 1-4, the affidavit submitted by United States Immigration and Customs Enforcement ("ICE") Special Agent Daniel P. Lamarca in support of the wiretap application, see Am. and Corrected Aff. Supp. Appl. Authorization Intercept Wire Communications ("Lamarca Affidavit" or "Lamarca Aff."), ECF No. 137-1, listed, *inter alia*, the following sources of probable cause for the wiretap:

- Beginning in or about 2007, the Italian Justice Ministry, together with Italian law enforcement authorities, commenced an investigation into sources of drug trafficking into Italy, including by individuals based in New York. Lamarca Aff. ¶ 19. Ultimately, hundreds of people were arrested and/or indicted, both in Italy and the United States. Id. Among those prosecuted were an Italian national living in Queens, Giulio Schirippa, and an American co-conspirator, Christopher Castellano, who were charged in the Southern District of New York. Id. Castellano proffered with the government, advising that in 2008 he had personally observed his and Schirippa's cocaine supplier ("CI-1") begin to meet with Gregorio. Id. ¶¶ 19-21. Castellano also stated that he came to learn that around that same time, Gregorio purchased $50,000 worth of cocaine directly from CI-1. Id. ¶ 21. Castellano was shot and killed in 2009, while free on bail pending disposition of his case. Id. ¶ 22.

- CI-1 pled guilty to a narcotics-trafficking felony charge and cooperated with the government.[1] Id. ¶ 23. During this cooperation, in or about 2008, CI-1 informed the

---

[1] CI-1 is a foreign national and requested that his/her cooperation be taken into consideration with respect to his/her asylum petition. Id. ¶ 23.

government that he/she had sold cocaine to Gregorio on numerous occasions. Id. ¶¶ 24-25. CI-1 stated that Gregorio shipped the drugs to Italy via an unknown commercial carrier or shipping company. Id. ¶ 24. Eleonora would then retrieve the drugs in Italy for distribution. Id. CI-1 believed that Gregorio was purchasing this cocaine through funding obtained from Anthony Federicci—a captain in the Genovese organized crime family of La Cosa Nostra—because he/she had observed Gregorio and others bringing large sums of cash to and from a social club adjacent to Cucino Amodo Mio and owned by Federicci. Id. ¶¶ 12, 25.

- A second confidential informant ("CI-2"), also criminally associated with Schirippa, advised the government that in or about mid-2008, Schirippa owed Gregorio a large sum of money and that the informant had once seen Schirippa make a payment of $30,000 in cash to Gregorio. Id. ¶¶ 26, 28.

- A third confidential informant ("CI-3")—an individual with prior narcotics criminal history cooperating in hopes of obtaining consideration with respect to pending criminal charges—said that in 2008 or 2009, prior to Castellano's murder, Gregorio complained in CI-3's presence that Schirippa and Castellano owed Gregorio a large sum of money for a shipment of cocaine to Italy that they claimed was of poor quality and un-sellable. Id. ¶ 29. Gregorio had further stated that the source of the money for the cocaine was Anthony Romanello, a subordinate of Federicci. Id. ¶¶ 12, 29.

- In November 2011, ICE and United States Drug Enforcement Administration ("DEA") agents conducted visual surveillance of Cucino Amodo Mio and the adjacent social club. Id. ¶¶ 30-32. On November 9, 2011, the agents observed Gregorio meeting with a Hispanic male, "John Doe 1" (later identified in a collateral investigation as a cocaine supplier), inside a nearby restaurant owned by Federicci. Id. ¶ 30. On November 10, 2011, agents observed Gregorio with John Doe 1 and two other Hispanic males, "John Doe 2" and "John Doe 3," entering and exiting Cucino Amodo Mio and the adjacent social club. Id. ¶ 31. And on the morning of November 11, 2011, an agent observed Gregorio conversing with John Doe 1 in front of the social club. Id. ¶ 32. On the night of November 11, 2011, agents observed John Doe 2 and John Doe 3 drive up to the social club. Id. When the agents later stopped the vehicle for a speeding violation, they found over $500,000 inside a hidden compartment built into the vehicle. Id. A fourth confidential informant ("CI-4")—an individual of undescribed background—had previously advised the government that Gregorio had approximately 14 kilograms of cocaine, which at that time would have been worth approximately $500,000, hidden in a safe at Cucino Amodo Mio. Id. ¶ 33.

- On November 21, 2011, agents consensually monitored an unrecorded phone call between CI-4 and Gregorio. Id. During this call, agents overheard Gregorio telling CI-4 about an attempted break-in at Cucino Amodo Mio. Id. Gregorio indicated during the call that he possessed surveillance video of the break-in attempt, and that "people from Mexico" were curious to find out any news about the video. Id. Gregorio also stated that "my people are hungry and there's no food." Id. The agents believed these comments to be coded references to Gregorio's efforts to determine who had attempted to steal the cocaine then stored at Cucino Amodo Mio and to the need to resolve the matter because Gregorio's cocaine customers were in need of re-supply. Id.

- In or about 2013, Gregorio stated in a conversation witnessed by CI-3 that he and Angelo were looking for new distribution partners in Italy. Id. ¶ 34. Gregorio stated that he had developed a reliable method of smuggling cocaine from New York to Italy and that he was seeking to make a shipment of as many as 50 kilograms. Id. Gigliotti further stated that he wished to deal directly with Schirippa's cocaine buyer and distributor in Italy. Id.

- In or about February 2014, Gregorio stated in the presence of CI-3 that he had recently travelled to Italy in search of buyers for a shipment of 10 kilograms of cocaine. Id. ¶ 35. Gregorio stated that he had managed to sell only 7 of the 10 kilograms for an unspecified sum above $40,000 per kilogram. Id. Gregorio indicated that he was unhappy with that price, and he stated that he had left the remaining 3 kilograms of cocaine with his "cousin," who was charged with the task of finding better offers. Id. Around the same time, Gregorio and Angelo discussed in CI-3's presence their intention to send between 50 and 100 kilograms of cocaine to Italy that summer. Id. ¶¶ 43, 46.

- On May 6, 2014, Italian authorities provided the Federal Bureau of Investigation ("FBI") and ICE with an intercept of an April 15, 2014, call between an Italian telephone number being used by co-defendant Franco Fazio, Gregorio's cousin, and the Cucino Landline (the "Oil Conversation"). Id. ¶ 37. The call was intercepted by the Italian National Police ("INP") as part of an ongoing narcotics trafficking investigation of Italian citizens and members of the 'Ndrangheta, a powerful international crime syndicate that originated in Italy. Id. ¶¶ 18, 37. On the call, Gregorio asks Fazio, "Has all the oil been given to my buddy?" Id. ¶ 37. When Fazio replies yes, Gregorio responds, "Okay, thirty-one, all right . . . ." Id. Agent Lamarca believed that "oil" was code for cocaine and that "thirty-one" was the price per kilogram of cocaine, in thousands of dollars. Id. ¶ 38.

- Agent Lamarca was advised by a member of the INP that in June 2014 (the affidavit does not provide a specific date), at 11:07 a.m. EDT, Italian law enforcement intercepted a call between Fazio and an Italian public pay phone being used by an individual identified only as "Agostino" (the "Agostino Conversation"). Id. ¶ 44. During that conversation, Agostino allegedly asked Fazio, in sum and substance, whether he and his cousin were "ready for work." Id. Fazio allegedly responded, in sum and substance, that everything was ready to go and that his cousin was scheduled to travel to Italy soon. Id. Agent Lamarca stated that he had been advised by the INP agent and a FBI special agent fluent in Italian that the phrase "ready for work" is a commonly-used code in Italian drug trafficking. Id. Agent Lamarca and his colleagues in Italy and the FBI believed that the conversation was a coded reference to a planned meeting between Fazio, Gigliotti, and Agostino in Italy at the end of June 2014, at which they intended to consummate a cocaine trafficking transaction. Id.

The Lamarca Affidavit also discussed toll records for the Cucino Landline, collected pursuant to a grand jury subpoena, and the results of a pen register authorized by the Honorable Judge Marilyn D. Go, United States Magistrate Judge for the Eastern District of New York, on April 30, 2014. Id. ¶¶ 39-47. Those records allegedly revealed the following:

- In May 2014, the Cucino Landline repeatedly contacted a telephone number whose user was unknown, but which was in regular contact with a purported avocado importation business that was the subject of a Department of Homeland Security ("DHS") narcotics investigation. Id. ¶ 40.

- On May 29, 2014, the Cucino Landline was in communication with a telephone number registered to a business owned and/or controlled by, according to CI-3, a member or affiliate of the 'Ndrangheta who had been involved in the importation of narcotics into the United States since the 1980s. Id. ¶ 41.

- During May and June 2014, spikes in call traffic between the Cucino Landline and telephone numbers associated with Fazio and Angelo correlated with numerous calls from the Cucino Landline to a number subscribed to a New Jersey company known as DPG Foods, Inc. ("DPG"), which appeared to do no advertising of any services it may offer. Id. ¶¶ 42, 45.

- Through June 7, 2014, the Cucino Landline repeatedly contacted a Flushing, New York customs brokerage and freight forwarding business that operated under a variety of names. Id. ¶ 46. Agent Lamarca believed that those calls related to defendants' narcotics trafficking activities. Id.

- The Cucino Landline repeatedly contacted a variety of telephone numbers based in Costa Rica. Id. ¶ 47. Agent Lamarca represented that Costa Rica, among other countries in the area, is a hub for narcotics trafficking into the United States. Id. Agent Lamarca also noted that Gregorio and Eleonora both had multiple border crossings into Costa Rica, sometimes staying in the country for only a few days. Id.

In the "Prior Applications" section, the Lamarca Affidavit stated that a search of the FBI, DEA, and DHS databases revealed that there had been no prior applications for wire, oral, or electronic surveillance of the Cucino Landline. Id. ¶ 15.[2] The affidavit noted, however, that since at least 2008, United States law enforcement has coordinated and exchanged information with the Italian Justice Ministry, the INP, and others, regarding the ongoing criminal activities of

---

[2] The affidavit did note that Gregorio and Angelo were both named in two wiretap applications authorized by judges in the Southern District of New York in 2012. Id. ¶¶ 16-17, 49-52. Agent Lamarca represented, however, that (a) some of the calls intercepted pursuant to the first wiretap may not have been properly minimized—and, as a result, none of those interceptions were used in support of the investigation of this case—and (b) no pertinent calls were intercepted pursuant to the second wiretap. Id. ¶ 49-52.

the 'Ndrangheta. Id. The affidavit stated that in or about April 2014, Agent Lamarca learned that the Italian Justice Ministry had authorized electronic surveillance of an Italian cellular telephone used by Fazio. Id. Agent Lamarca stated that to his knowledge, the INP continued to monitor that telephone, but he stated that "the United States and Italy are not conducting a joint investigation, only merely sharing on a voluntary basis certain relevant information." Id. "Accordingly," he stated, he was "not privy to all the details of the INP's on-going investigation." Id. Later in the affidavit, Agent Lamarca stated the following:

> As noted above, members of Italian law enforcement are present[ly] engaged in the electronic surveillance of citizens believed to be engaged with the 'Ndrangheta and the distribution of narcotics. Although one of those wiretaps has led to the interception of a pertinent call over the [Cucino Landline], the goals and objectives, and even the targets of the American and Italian investigations are quite different. The two countries are not running a joint investigation but merely sharing information with each other when appropriate. The objectives of this investigation, which focuses on American citizens or residents engaged in the violation of federal drug laws cannot be met by relying on the happenstance of possible future interceptions of the [Cucino Landline] overseas, nor is the interception of such communications certain to be deemed admissible in a United States courtroom.

Id. ¶ 66.

II.  Prior Motions

Gregorio, Eleonora, and Angelo were indicted on April 22, 2015, on one count of conspiracy to import cocaine. ECF No. 45. A superseding indictment filed on May 6, 2015, added Fazio as a fourth defendant, as well as five more counts, including two counts of importation of cocaine, one count of conspiracy to possess cocaine with the intent to distribute, one count of attempted possession of cocaine, and one count of unlawful use and possession of firearms. ECF No. 51. A second superseding indictment filed on May 26, 2016, added one

count of possession of a defaced firearm against Gregorio, and one count of being a felon in possession of firearms against Angelo. ECF No. 154.

On August 19, 2015, Gregorio, Eleonora, and Angelo filed joint pretrial motions, seeking, *inter alia*, an order from the Court (a) suppressing evidence obtained from the wiretap on the Cucino Landline because the wiretap was not supported by probable cause; and (b) directing the government to provide additional discovery regarding the nature of its cooperation with Italian authorities. Mem. Law Supp. Pretrial Mots. ("Defs.' Initial Mem."), ECF No. 76. This Court denied defendants' motion to suppress on November 6, 2015, finding that "the [Lamarca Affidavit] taken as a whole provides ample basis for Judge Spatt's finding of probable cause." Mem. and Order at 17, ECF No. 104. The Court, however, desired limited additional information from the government regarding the nature of its cooperation with Italian authorities before ruling on defendants' discovery motion. Specifically, the Court wished to better understand the extent to which United States authorities may or may not have assisted the Italians in intercepting calls to or from defendants' U.S.-based telephone numbers.

At the Court's request, the government, on November 23, 2015, filed a supplemental response to defendants' discovery demand. ECF No. 109. The government acknowledged that United States and Italian law enforcement had been cooperating for years in efforts to target drug traffickers and members of the 'Ndrangheta, see id. at 1, but it insisted that "[i]nformation obtained from Italian law enforcement, while clearly useful and supportive of the American investigation, was the result of appropriate and lawful information-sharing between two countries conducting independent investigations that had some overlapping targets, not the result of Italian law enforcement acting as agents of the United States in an effort to circumvent due process of the Constitution," id. at 3. The government represented that "Italian

law enforcement did not seek, and no American agency provided, any assistance in wiretapping" the U.S.-based or Italy-based telephone numbers over which the defendants may have been intercepted. Id. at 2. "Rather, communications to or from the U.S.-based phones [were] secured through Italian judicial orders, and through the use of Italian or other international telecommunication facilities." Id. The government also noted that it had not located any evidence that Italian agents had intercepted purely domestic calls (*i.e.*, calls between two U.S.-based telephone numbers), as opposed to international calls. Id.

After counsel for Gregorio responded on December 10, 2015, ECF No. 111, attacking many of the assertions made by the government in its November 23, 2015, letter and other communications between the parties, the government submitted a *second* supplemental response on December 18, 2015, ECF No. 113. The government reiterated that although United States and Italian law enforcement had cooperated with one another for years, there was no evidence to support any claim that United States law enforcement had acted improperly or circumvented the Constitution. ECF No. 113. The government also explained that it had already provided defendants with substantial discovery in the ordinary course, including audio recordings of calls intercepted by Italian law enforcement over eleven telephone numbers and two car bugs, along with corresponding linesheets, and the requests and court authorizations for those wiretaps and bugs executed by Italian authorities. Id. at 1. The government stated that "[t]he discovery from Italian sources makes clear that the interception of the defendants here, over international calls, was the product of Italian law enforcement complying with their own laws." Id. at 3.

On January 8, 2016, this Court denied defendants' motion for discovery, stating that it "readily concludes that additional discovery is not warranted and that no valid basis for an exploratory hearing has been established." Docket Entry dated Jan. 8, 2016.

III.   Present Motions

On January 6, 2016, two days before the Court's ruling on defendants' initial discovery motion, Angelo Gigliotti secured new counsel. See ECF Nos. 115-16. Then, on March 24, 2016, Angelo's new counsel filed the present supplemental pretrial motions on Angelo's behalf, noting that Gregorio and Eleonora join in the motion. See Mem. Law Supp. Angelo Gigliotti's Suppl. Pretrial Mots. ("Defs.' Mem.") at 1, ECF No. 138.[3] Echoing many of the same points raised earlier, defendants once again seek an order from the Court suppressing evidence obtained from the wiretap on the Cucino Landline, this time pursuant to (i) Franks v. Delaware, 438 U.S. 154 (1978), because, it is argued, the government intentionally or recklessly misled the authorizing court with respect to the probable cause supporting the wiretap application; and (ii) United States v. Maturo, 982 F.2d 57 (2d Cir. 1992), because the collaboration between United States and Italian law enforcement with respect to this case violated defendants' Constitutional rights. See Defs.' Mem. at 7-36. In the alternative, defendants seek a hearing on these matters. Id. at 7, 31, 32, 36. In addition, defendants once again request additional discovery concerning the cooperation between United States and Italian law enforcement. Id. at 32, 36.

DISCUSSION

I.   Suppression of Evidence Pursuant to *Franks v. Delaware*

"Title III of the Omnibus Crime Control and Safe Streets Act of 1968 provides for court-ordered interceptions of communications." United States v. Yannotti, 541 F.3d 112, 124 (2d Cir. 2008) (citing 18 U.S.C. § 2518). "The statute allows a court to authorize a wiretap 'if it determines, on the basis of the facts submitted by the applicant, that there is probable cause to

---

[3] Angelo's counsel filed an initial copy of his memorandum in support of the motions on March 24, 2016. ECF No. 136. He then filed a corrected copy of the memorandum the next day. ECF No. 138. References to "Defs.' Mem." refer to the *corrected* copy of the memorandum.

believe (1) that an individual was committing, had committed, or is about to commit a crime; (2) that communications concerning that crime will be obtained through the wiretap; and (3) that the premises to be wiretapped were being used for criminal purposes or are about to be used or owned by the target of the wiretap.'" Id. (quoting United States v. Diaz, 176 F.3d 52, 110 (2d Cir. 1999)).

"The standard for probable cause applicable to § 2518 is 'the same as the standard for a regular search warrant.'" Diaz, 176 F.3d at 110 (quoting United States v. Fury, 554 F.2d 522, 530 (2d Cir. 1977)). Probable cause is analyzed under the "totality of the circumstances." Illinois v. Gates, 462 U.S. 213, 238 (1983). That is, the issuing judge must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Id. "Due to this subjective standard, a reviewing court generally accords 'substantial deference to the finding of an issuing judicial officer that probable cause exists,' limiting [its] inquiry to whether the officer 'had a substantial basis' for his determination." United States v. Raymonda, 780 F.3d 105, 113 (2d Cir. 2015) (quoting United States v. Wagner, 989 F.2d 69, 72 (2d Cir.1993)); see also Gates, 462 U.S. at 236, 238.

On November 6, 2015, this Court denied defendants' previous attempt to suppress evidence obtained pursuant to the wiretap on the Cucino Landline, finding that despite defendants' assertions to the contrary, "the [Lamarca Affidavit] taken as a whole provides ample basis for Judge Spatt's finding of probable cause." Mem. and Order at 17, ECF No. 104. The Court noted that Castellano and four confidential informants "all told virtually the same story and surveillance of the restaurant and social club supported at least some of the information

provided." Id. The Court also noted that "more than one confidential informant had stated that Gregorio was operating this criminal enterprise from the restaurant, and agents had observed Gregorio meeting with a cocaine supplier outside of the restaurant." Id. at 18. The Court further noted that although the vehicle that was stopped by agents in November 2011 had no direct connection to Gregorio, Gregorio had been seen with the vehicle's occupants the day before, and the amount of money found inside the vehicle matched the street value of the cocaine that CI-4 had stated was at the Cucino Amodo Mio. Id. Lastly, the Court found that the inference that the Oil Conversation—which was made from the restaurant's landline—contained coded references to cocaine sales was "far from stretched, especially given the tip from CI-3 that [Fazio] was selling [Gregorio's] cocaine in Italy." Id. Thus, the Court concluded that "the wiretap application as a whole, considered under the totality of the circumstances, clearly provides a 'substantial basis' for Judge Spatt's determination that there was a fair probability that drug-related conversations would be intercepted." Id.

Despite this Court's earlier ruling, defendants once again seek to suppress evidence obtained from the wiretap on the Cucino Landline, this time pursuant to Franks v. Delaware because the wiretap application allegedly "contains material misrepresentations and omissions without which there was no basis to find probable cause." Defs.' Mem. at 7.

Under Franks, evidence obtained pursuant to a wiretap application containing erroneous information may be suppressed if the defendants show that: "(1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the [issuing] judge's probable cause [or necessity] finding." United States v. Rajaratnam, 719 F.3d 139, 146 (2d Cir. 2013) (alterations in original) (quoting United States v. Canfield, 212 F.3d 713, 717-18 (2d Cir. 2000));

11

see also United States v. Awadallah, 349 F.3d 42, 64 (2d Cir. 2003) ("In order to invoke the Franks doctrine, [the defendant] must show that there were intentional and material misrepresentations or omissions in [the] warrant affidavit."). The Second Circuit has applied this framework in the context of, *inter alia*, challenges to Title III wiretap applications. See Rajaratnam, 719 F.3d at 151-57.

In determining whether the alleged falsehoods or omissions were *necessary* to the issuing judge's probable cause finding, "[t]he ultimate inquiry is whether, after putting aside erroneous information and [correcting] material omissions, there remains a residue of independent and lawful information sufficient to support [a finding of] probable cause [or necessity]." Rajaratnam, 719 F.3d at 146 (alterations in original) (quoting Canfield, 212 F.3d at 718); see also McColley v. Cty. of Rensselaer, 740 F.3d 817, 823 (2d Cir. 2014) ("In determining whether omitted information was necessary to the finding of probable cause, 'we look to the hypothetical contents of a "corrected" application to determine whether a proper warrant application, based on existing facts known to the applicant, would still have been sufficient to support arguable probable cause to make the arrest as a matter of law.'" (quoting Escalera v. Lunn, 361 F.3d 737, 743-44 (2d Cir. 2004))).

Here, defendants allege the following misrepresentations and omissions with respect to the Lamarca Affidavit: (1) the government "materially omitted" from the affidavit—despite knowing full well—that Italian authorities had been intercepting calls over the Cucino Landline

12

since April 14, 2014,[4] see Defs.' Mem. at 10-16; (2) the government "deliberately mislead[]"

Judge Spatt into believing that the Italian authorities had begun a wiretap on Fazio's Italian

cellular telephone in April 2014, whereas, in reality, the Italians did not begin monitoring Fazio's

telephone until May 2014, see id. at 14-15; (3) the government "knowingly or recklessly

misstated" that the Oil Conversation concerned the sale of cocaine, see id. at 17-20; (4) the

government's account of the Agostino conversation was "pure fiction," and the government

falsely suggested that the conversation concerned a planned meeting between Fazio, Gregorio,

and Agostino in Italy to consummate a drug trafficking transaction, id. at 25-30; (5) the

government failed to acknowledge that none of the conversations intercepted over the Cucino

Landline during the period between the Oil Conversation and the Agostino conversation

supported probable cause, see id. at 21-24; and (6) the government falsely claimed that the

United States and Italy were not conducting a "joint investigation," see id. at 15.

As before, defendants' motion fails. While the Lamarca Affidavit does contain certain

limited errors and omissions—some of which do trouble the Court and warrant further

explanation by the government—the Court is not convinced that such errors and omissions were

deliberate or reckless. More importantly, the Court finds that even the hypothetical contents of a

"corrected" affidavit would have been sufficient to support probable cause. Therefore, the

alleged errors and omissions were not *necessary* to Judge Spatt's probable cause finding, and

neither suppression nor a hearing is warranted.

---

[4] In their opening brief, defendants make reference to an Italian "wiretap" of the Cucino
Landline. See, e.g., Defs.' Mem. at 10-16. After the government challenged this
characterization, see Government's Mem. Law. Opp'n Defs.' Suppl. Pretrial Mots. ("Gov't
Mem.") at 31 n.10, 33 n.12, ECF No. 145, defendants acknowledged that "the Italian electronic
surveillance [of the Cucino Landline] was not a 'wiretap' in the traditional sense," given that it
was intended to intercept only calls made to or from Italy. See Reply Mem. Further Supp.
Angelo Gigliotti's Suppl. Mots. ("Defs.' Reply") at 5 n.2, ECF No. 148.

The government acknowledges that the affidavit should have "set forth the full circumstances of the Italian monitoring of the Cucino Telephone." Gov't Mem. at 32. The government also acknowledges that the affidavit should have stated that the Italian authorities began monitoring Fazio's Italian cellular telephone in *May* 2014—rather than April 2014, as stated in the affidavit—and that from the affidavit, "one might infer that the April 15 Oil Conversation was captured on the FAZIO Cellphone when . . . it was actually captured on the Italian monitoring of the Cucino [Landline]." Id. at 31-32. The government denies, however, that either error was made intentionally or recklessly. See id. at 30-39. Rather, the government argues that the errors were simply the product of sporadic information-sharing between two parallel, fast-moving investigations being conducted in different languages and within different legal frameworks. Id. at 34-36. The government also emphasizes that since the Italians' monitoring of the Cucino Landline was designed to intercept only calls between the Cucino Landline and telephones in Italy,[5] and since the government did not have real-time access to the calls that were intercepted, the Italians' monitoring of the Cucino Landline did not eliminate the necessity of the wiretap applied for on June 30, 2014. See Gov't Mem. at 36-37.

The Court agrees that the affidavit should have disclosed that the Italians were monitoring the Cucino Landline as of April 2014, and that the Italian wiretap on Fazio's Italian cellular telephone did not begin until May 2014. The Court also appreciates that (a) the error

---

[5] Defendants note that despite the theoretically limited nature of the Italians' monitoring of the Cucino Landline, the Italians apparently did, in fact, intercept twenty calls between the Cucino Landline and Costa Rica or Switzerland. See Defs.' Reply at 5 n.2. While this is indeed curious and deserves a more satisfying explanation than the government's representation that "[t]he Italian authorities inadvertently intercepted a limited number of international communications between the Cucino [Landline] and telephones located in countries other than Italy," Gov't Mem. at 31 n.10, the existence of these interceptions does not alter the Court's assessment of the present motions.

regarding when the Italians began monitoring Fazio's telephone could have misled Judge Spatt into believing that the Oil Conversation was intercepted pursuant to the Italians' monitoring of Fazio's telephone, rather than their monitoring of the Cucino Landline, and that (b) Judge Spatt may otherwise have inquired further into how the Oil Conversation was intercepted. As discussed further below, however, the Court finds that this error and this omission were not necessary to Judge Spatt's probable cause finding. Therefore, the Court need not inquire further into whether they were made deliberately or recklessly—a serious allegation of which the Court is skeptical.

Defendants' argument that the Lamarca Affidavit failed to disclose that no conversations over the Cucino Landline during the period between the Oil Conversation and the Agostino Conversation supported probable cause, see Defs.' Mem. at 21-24, adds little to this analysis. While it may or may not be true that no other conversation intercepted during that period supported probable cause, compare Defs.' Reply at 8-11, with Gov't Mem. at 33-34, 37-38, this argument seems to be more properly an extension of the prior argument, regarding the government's failure to disclose the circumstances surrounding the Italians' monitoring of the Cucino Landline. That is to say, had the Lamarca Affidavit properly reflected that the Italians had been monitoring the Cucino Landline as of April 2014, including during the period between the Oil Conversation and the Agostino Conversation, then the fact that the affidavit made no reference to any additional conversations during that period would speak for itself.

Defendants' argument regarding the Lamarca Affidavit's characterization of the Oil Conversation is a non-starter. First, defendants' belief that the recording reflects that Gregorio says "tutto quanto," rather than "thirty-one," see Defs.' Mem. at 18-19, is irrelevant because, as the government points out, Agent Lamarca did not have access to the actual recording as of June

15

30, 2014, and he accurately shared the ICE translation of the Italian transcript provided by Italian law enforcement.[6] See Gov't Mem. at 41. Second, the Court is not concerned by the alleged inconsistency between the $31,000 per kilogram price of cocaine articulated in the Oil Conversation and other prices of cocaine articulated elsewhere in the affidavit. See Defs.' Mem. at 19-20. Even if this were a legitimate inconsistency, which the governments disputes, it was fully disclosed to the reviewing court. See Gov't Mem. at 42-43. Third, defendants' argument that "oil" was in fact a reference to olive oil, rather than code for cocaine, says nothing about Agent Lamarca's subjective belief at the time he drafted the affidavit, and defendants offer no proof that Agent Lamarca did not reasonably believe—based on his training and experience and in reliance on the information provided to him by Italian investigators with relevant expertise—that "oil" was indeed code for cocaine. This Court agrees with the government that "defendants have not demonstrated that Agent Lamarca's description of the April 15 Oil Conversation was untrue, let alone intentionally or recklessly misleading." Gov't Mem. at 45.

Defendants' argument regarding the Lamarca Affidavit's characterization of the Agostino Conversation is a closer call. Defendants are correct that the actual transcript of the conversation seems to bear little resemblance to the summary provided in the affidavit, and the government's arguments to the contrary are unpersuasive.[7] It is also noteworthy, as defendants point out, that Agent Lamarca did not provide any quoted excerpts from the Agostino Conversation in the

---

[6] The Court also notes that it did, at defense counsel's urging, see Defs.' Mem. at 19, listen to the audio recording for itself. While the Court certainly does not claim to have any expertise concerning the Italian language, the portion of the recording in question—which defense counsel provided to the Court on a CD, repeated five times—sounded nothing like "tutto quanto."

[7] The government assertion, for example, that Agostino's statement to Fazio, "send [your cousin] my regards . . . since you're going to Bologna," could suggest merely that the mention of Bologna prompted Agostino to think of Fazio's cousin, not that Fazio would give his cousin Agostino's regards while in Bologna, see Gov't Mem. at 47, is stretched, to say the least.

affidavit, as he had for the Oil Conversation, despite apparently having access to the transcript of the call. See Defs.' Mem. at 27; Gov't Mem. at 45, 48. Nevertheless, the government is correct that Agent Lamarca "specifically stated that the conversation was reported in 'sum and substance,' and did not purport to quote the statement verbatim." Gov't Mem. at 45. It also appears to be the case that Agent Lamarca truthfully reported what he had been told by the Italian investigator and an FBI agent fluent in Italian regarding the conversation. Id. at 46, 48. As such, while defendants' arguments here have merit and give the Court pause, the Court, on balance, is not convinced that Agent Lamarca's characterization of the Agostino conversation necessarily rose to the level of representing a deliberate falsehood or reckless disregard for the truth. More importantly, however, for the reasons discussed below, the Court does not find that any misrepresentation regarding the Agostino Conversation was necessary to Judge Spatt's probable cause finding.

Lastly, defendants' argument that the government falsely claimed that the United States and Italy were not conducting a "joint investigation," id. at 15, has no merit. As discussed at greater length below, see infra Part II, there is simply no evidence that Agent Lamarca's characterization of the cooperation and coordination taking place between the two governments was materially inaccurate.

In sum, although defendants' arguments regarding the Oil Conversation and the cooperation between the United States and Italian authorities have no merit, defendants are correct that the Lamarca Affidavit reflects certain misrepresentations and omissions. Specifically, the affidavit (1) failed to disclose that the Italians had been intercepting calls over the Cucino Landline since April 2014; (2) erroneously stated that the Italian authorities had

begun a wiretap on Fazio's Italian cellular telephone in April 2014 rather than in May 2014; and (3) arguably misrepresented the Agostino Conversation.

Thus, a "corrected" affidavit would have disclosed that the Italians had been monitoring the Cucino Landline for over two months and that they had intercepted very few incriminating calls (potentially only the Oil Conversation) during that time. The affidavit would also have made clear, however, that the Italians were not intercepting *all* calls to and from the Cucino Landline—in particular, they were not intercepting calls between the Cucino Landline and other U.S.-based telephones—and the affidavit would still contain (a) the information provided by Castellano and the four confidential informants, (b) the results of the agents' physical surveillance and vehicle stop in November 2011, (c) the information concerning the toll records and pen register results, and (d) the information regarding defendants' border crossings. See Gov't Mem. at 25-30; supra pp. 2-5, 10-11. The Court concludes that such an affidavit would still have provided a substantial basis for Judge Spatt's determination that there was a fair probability that drug-related conversations would be intercepted, as indeed they were. Thus, defendants' motion to suppress the wiretap evidence is again denied, as is defendants' request for a hearing. See Franks, 438 U.S. at 171-72 (stating that "if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required"); United States v. Cromitie, No. 09-CR-558 (CM), 2010 WL 3025670, at *2 (S.D.N.Y. July 28, 2010) ("The Second Circuit has emphasized that the standard for suppression 'is a high one.' Even to merit a hearing on the issue, a defendant must make 'a substantial preliminary showing' of *both* elements." (emphasis in original) (internal citation omitted) (quoting Rivera v. United States. 928 F.2d 592, 604 (2d Cir. 1991), and Franks, 438 U.S. at 155)).

18

II.    Suppression of Evidence Pursuant to *United States v. Maturo* and Additional Discovery

"[W]iretap evidence may be admissible when foreign officials, acting on their own to enforce foreign law, properly follow their own law in obtaining the evidence, even where the subject of the foreign search is an American citizen." United States v. Maturo, 982 F.2d 57, 60 (2d Cir. 1992) (internal citation omitted). "[E]vidence obtained in a foreign jurisdiction may be excluded," however, (a) "where the conduct of foreign officials in acquiring the evidence is 'so extreme that they shock the judicial conscience,'" or (b) "where cooperation with foreign law enforcement officials may implicate constitutional restrictions." Id. at 60-61 (quoting Stowe v. Devoy, 588 F.2d 336, 341 (2d Cir. 1978)). "Within the second category for excluding evidence, constitutional requirements may attach in two situations: (1) where the conduct of foreign law enforcement officials rendered them agents, or virtual agents, of United States law enforcement officials; or (2) where the cooperation between the United States and foreign law enforcement agencies is designed to evade constitutional requirements applicable to American officials." Id. at 61 (internal citation omitted).

Defendants argue that the evidence obtained pursuant to the wiretap on the Cucino Landline should be suppressed pursuant to Maturo "in light of compelling evidence that cooperation with Italian law enforcement officials by American law enforcement 'may [have] implicate[d] constitutional restrictions.'" Defs.' Mem. at 32 (alterations in original). In the alternative, defendants ask for a hearing. Id. at 32, 36. Defendants also renew their earlier application for discovery concerning the degree of cooperation between the two governments. Id.

The Court has heard these arguments before and rejected them. This issue, on slightly different terms, was briefed last year, see ECF No. 76 at 17-24; ECF No. 95 at 23-27; ECF No.

99 at 5-6, and discussed during oral argument on October 8, 2015. See ECF No. 100. The government then filed *two* supplemental letters addressing this issue. See ECF Nos. 109, 113; see also ECF No. 111. Following all of this, on January 8, 2016, this Court denied defendants' prior motion for additional discovery related to the cooperation between United States and Italian law enforcement, readily concluding that additional discovery was not warranted and that no valid basis for an exploratory hearing had been established. See Docket Entry dated Jan. 8, 2016.

Defendants now, once again, raise the specter of improper cooperation between the United States and Italian governments. See Defs.' Mem. at 32-36; Defs.' Reply at 20-23. Defendants add precious little new evidence to the discussion, however, and the Court, once again, readily concludes that additional discovery is not warranted and that an exploratory hearing is not necessary. The Court likewise finds that there is no basis to suppress evidence pursuant to Maturo. The government has acknowledged from the outset that the United States and Italian authorities have—as they should—cooperated with one another for years. There is simply no evidence, however, that the conduct of the Italian law enforcement officials rendered them agents, or virtual agents, of United States law enforcement, or that the cooperation between the two governments was designed to evade constitutional requirements applicable to United States officials. The government has also made clear, several times, that while it is true that the Italians were monitoring calls to and from the Cucino Landline as of April 2014, they were doing so as part of an independent investigation, and they did not receive any technical assistance from the United States government in doing so.

20

CONCLUSION

For the reasons discussed above, the Court denies defendants' supplemental pretrial motions. Suppression of the evidence obtained pursuant to the wiretap on the Cucino Amodo Mio landline telephone is not warranted under <u>Franks</u>, nor is it warranted under <u>Maturo</u>. There is likewise no basis to hold a hearing regarding the suppression of evidence under either theory, nor is there any basis to grant defendants additional discovery regarding the cooperation between United States and Italian authorities.

SO ORDERED.

Dated: Brooklyn, New York
      June 30, 2016

                              /S/ USDJ RAYMOND J. DEARIE

                              RAYMOND A. DEARIE
                              United States District Judge